UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 2:21-cr-00148-JDL |
| | ) | |
| DEBORAH MOORE | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, Darcie N. McElwee, United States Attorney for the District of Maine, and Jeanne D. Semivan, Special Assistant United States Attorney, hereby files the Government's Sentencing Memorandum with respect to Deborah Moore. The United States respectfully recommends that the Court impose an order of restitution to the Social Security Administration ("SSA") in the amount of $112,980.00, a sentence at the low end of the applicable guideline range, and a three-year period of supervised release, along with all standard and special conditions recommended by the PSR. Such a sentence would not be greater than necessary to achieve the purposes of sentencing delineated in Title 18, United States Code, Section 3553(a)(2).

## Background

On September 22, 2021, the grand jury returned a two-count indictment charging the defendant with Supplemental Security Income (SSI) benefit fraud (Concealment) and Theft of Government Money (ECF No. 1). On March 30, 2022, the defendant appeared before the Court via video, and pled guilty to both counts of the indictment (ECF No. 33).

The Revised Presentence Investigation Report ("PSR") determined that there was a base offense level of 6, with an enhancement of 8 levels because the loss amount of $112,980.00 was more than $95,000, but not more than $150,000, yielding an offense level of 14 (see PSR ¶¶ 21-22). A reduction of 2 levels for the acceptance of responsibility

produced a total offense level of 12 (see PSR ¶¶ 28-29). The PSR further determined that the defendant had a criminal history score of zero, establishing a Category I criminal history (PSR ¶ 33). The resulting advisory guideline range is 10 to 16 months, in Zone C of the Sentencing Table (PSR ¶ 50) (citing U.S.S.G. § 5C1.1(d)). The government agrees with these guideline calculations.

## Argument

The Government submits that restitution is warranted based on the factors identified in 18 U.S.C. § 3663(a)(1)(B). The Government further submits that a fair analysis of the Section 3553(a) factors is consistent with a sentence at the low end of the advisory guideline range, with a period of supervised release imposing all conditions recommended by the PSR. Such a sentence would be sufficient, but not greater than necessary, to promote deterrence and respect for the law. The facts of this case do not support the downward departures the defendant indicated she would seek, or variances concerning a COVID plea agreement or white collar offenses. Nor is it clear that the facts support variances on the basis of health, mental health, and age.

**A) An order of restitution to the Social Security Administration for partial restitution is required, and a full order of restitution is appropriate.**

Pursuant to 18 U.S.C. § 3663, restitution shall be ordered when a defendant is convicted of an offense under Title 18. Accordingly, this Court must order that the defendant pay restitution to SSA in the amount of $23,103.00.

Pursuant to 42 U.S.C. § 1383a(b)(1), a Court "may order, in addition to or in lieu of any other penalty authorized by law, that the defendant make restitution to the Commissioner of Social Security, in any case in which such offense results in the Commissioner of Social Security making a benefit payment that should not have been

made…". Pursuant to 42 U.S.C. § 1383a(b)(2), sections 3612, 3663, and 3664 of Title 18 shall apply with respect to the issuance and enforcement of orders of restitution under this subsection.

When determining whether to order restitution, 18 U.S.C. § 3663(a)(1)(B) directs the Court to consider (I) the amount of the loss sustained by each victim as a result of the offense; and (II) the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

Ordering the defendant to make restitution to SSA would be a component of an appropriate, just sentence. The Supreme Court has held that the purpose of awarding restitution is "to mete out appropriate criminal punishment" for fraudulent conduct. Pasquantino v. United States, 544 U.S. 349, 365 (2005). Restitution is a criminal penalty meant to have deterrent and rehabilitative effects. United States v. Savoie, 985 F.2d 612, 619 (1st Cir. 1993). It is also a means by which a defendant can restore ill-gotten gains to the victim of a crime. United States v. Leahy, 438 F.3d 328, 333 (3d Cir. 2006). By concealing material information relating to the composition of her household, the defendant fraudulently received the financial benefit of $112,980 in Supplemental Security Income payments over nearly 14 years. Requiring the defendant to repay the funds she received by fraud is an integral part of an appropriate sentence.

Additionally – and here, most saliently – ordering the defendant to pay restitution to SSA would serve to deter others from engaging in similar criminal activity. SSI benefits are paid to those members of society who are not only medically disabled, but who also have limited income and resources. Eligibility for benefits under this program requires that

the recipient have income and resources within certain specified limits. SSI beneficiaries, by definition, lack significant financial resources. The government acknowledges the defendant's age and reportedly limited financial resources (see PSR ¶ 48) reduce the likelihood of full recovery of the loss to SSA in practical terms. However, a sentence that does not require the defendant to restore the funds she obtained from SSA by fraud because her finances are limited could embolden other similarly-situated individuals to engage in fraudulent conduct when attempting to obtain government benefits. Conversely, a sentence that requires the defendant to repay her ill-gotten gains would better deter others from participating in this type of criminal activity.

Accordingly, the government submits that an order of full restitution is the most crucial component of a just sentence. For this, and all of the other reasons identified above, the government respectfully asks that the Court order the defendant to pay restitution to SSA in the amount of $112,980.

B) **This Court should not apply a "COVID-Variance" because there was no plea agreement in this case to support one.**

The defendant should not receive a downward variance simply because she agreed to appear by video for her Rule 11 hearing in March of 2022. It is true that the government had a formal policy in place from August 12, 2020 to May 30, 2021, pursuant to which it agreed to recommend a variance for defendants who agreed to proceed by video. But that policy was implemented at the height of the pandemic, when the court was not conducting in-person proceedings. The purpose was to address the inevitable backlog that would flow from the cessation of in-person proceedings, facilitate the appropriate disposition of cases, and avoid delaying proceedings until the normalization of court operations. The government's so-called "COVID plea agreement"

4

sought to move those cases forward and obtain both finality and certainty by securing important concessions from the defendant.

Notably, the recommended variance was not simply for agreeing to appear by video; the policy required a defendant to do much more than just waive their right to be physically present for court proceedings. The COVID plea agreement included language that was not in the government's standard plea agreement. Most importantly, the agreement required a defendant to admit to facts that established the elements of the charged offense, and it severely limited a defendant's ability to withdraw his or her plea of guilty. Defendants who signed this agreement gave the government a level of certainty with respect to charges that otherwise could have been delayed for many months until the court began operating in person again. Without this incentive, and without a trial list to force a defendant to make a decision about whether to plead guilty or go to trial, the government faced the prospect of dozens of defendants delaying the resolution of their cases and postponing the possibility of a trial for an indefinite period (which ultimately turned out to be almost a year). The defendant in this case is not similarly situated to those defendants who chose to enter into the COVID plea agreement during the height of the pandemic, when in-court proceedings were not even an option for the most part.[1]

---

[1] Indeed, the government made a decision to end the practice after the Court's decision on March 12, 2021, to normalize operations and to set a timeline for conducting in-person proceedings.  See General Order 2021-04 (available on court's website).  After the Court issued its General Order, the government decided to retire its COVID policy effective May 30, 2021.  Notably, the government provided members of the defense bar with ample advance notice of the impending expiration of the policy to permit defendants who were willing to resolve their cases early the opportunity to take advantage of the recommended variance.  The expiration date for the government's COVID policy/plea agreement was also announced at the Criminal Law Committee meeting held on March 25, 2021 – a meeting that was attended by the Federal Public Defender and representatives from the CJA Panel.

Here, the government ultimately resorted to obtaining an indictment once the Court began to normalize operations. At the time an indictment was returned in September 2021, both parties knew that a COVID plea agreement would not be an option. Additionally, there is no written plea agreement, meaning that the defendant never agreed to the language in the government's standard plea agreement, much less the more expansive language in the government's COVID plea agreement. Finally, this Court has continued to further normalize operations, as evidenced in its most recent September 12, 2022 amendment to General Order 2021-6 (available on the Court's website). While the Rule 11 hearing in this matter was held remotely, the sentencing will be held in-person.

For all these reasons, the defendant has not shown the extraordinary acceptance of responsibility contemplated by the COVID plea agreements, and no such downward variance is warranted in this case.

C) **No downward departure is warranted based on the defendant's age, or physical or mental condition.**

Considerations based on age, individually or in combination with other offender characteristics, may be relevant in determining whether a departure is warranted if they are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines. U.S.S.G. § 5H1.1. In particular, "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration." Id.[2] As such, even granting that the defendant's age of 69 would qualify her as "elderly," age

---

[2] There is no clear definition of what constitutes an "elderly" individual, although the First Circuit has stated that it "do[es] not consider a 63-year-old to be 'elderly' for purposes of sentencing." United States v. Rodriguez-Duran, 507 F.3d 749, 775 (1st Cir. 2007).

alone is insufficient for a departure; infirmity is also required. The First Circuit has also rejected the notion that a departure is appropriate based on the interrelationship between a defendant's age and the anticipated length of their sentence. See United States v. Jackson, 30 F.3d 199, 202-203 (1st Cir. 1994) (citing cases).

Likewise, a defendant's mental and physical conditions may be relevant in determining whether a departure is warranted "if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." U.S.S.G. §§ 5H1.3, 5H1.4; see also United States v. LeBlanc, 24 F.3d 340, 348 (1st Cir. 1994) ("Departures based upon health problems are discouraged and can only be justified if the medical problems are present in unusual kind or degree."); United States v. Maldonado-Montalvo, 356 F.3d 65, 74 (1st Cir. 2003) ("[D]epartures based upon a defendant's mental condition are discouraged, which means that the sentencing court must first make a finding that the mental condition is extraordinary or atypical[.]") (internal citations omitted); United States v. Hoey, 508 F.3d 687, 693 (1st Cir. 2007) (emphasizing a physical infirmity must be "*extraordinary*" to merit a downward departure, and might be justified in an unusual case where the defendant "would not get, or was at least unlikely to get, adequate treatment in prison.") (emphasis in Hoey) (citing United States v. Derbes, 369 F.3d 579, 582 (1st Cir. 2004)); United States v. Baron, 914 F. Supp. 660, 662–63 (D. Mass. 1995) (court must consider whether defendant's impairments pose serious and imminent medical threats, which would be made worse by incarceration and/or which the Federal Bureau of Prisons could not adequately treat).

In the instant case, the PSR recounts Defendant's medical history, including kidney stones and diabetes; a hip-replacement surgery; placement of a heart stent in September 2019; a one-night hospitalization for swelling and heart palpitations on April 1, 2022; and a history of anasarca, chronic diastolic heart failure, pulmonary hypertension, and obstructive sleep apnea (PSR ¶ 42). She also reported taking 14 medications for various conditions (id.). While the PSR references unsuccessful attempts to acquire additional records and notes that a significant cardiology appointment remained outstanding (id.), it is unclear what, if any, regular treatment the defendant receives for these conditions apart from medications. By extension, there is nothing to indicate that these conditions as a whole are present to an unusual degree, within the meaning of the Sentencing Guidelines. Similar or more significant conditions have failed to qualify for downward departures. See United States v. Herman, 848 F.3d 55, 59 (1st Cir. 2017) (district court reasonably declined to depart downward despite evidence that 61-year-old, 5'2" defendant weighing only 72 pounds, was diagnosed with malnourishment and dehydration during her trial, and reported suffering from tachycardia, where she did not regularly see any doctors, did not take any prescription medications, and did not submit any medical records substantiating her health issues, and there was no evidence that federal prison system could not deal appropriately with her medical problems); United States v. Tolson, 760 F. Supp. 1322, 1330 (N.D. Ind. 1991) (declining to depart downward where 60-year-old defendant suffered several physical problems, including onychomycosis of his fingernails and toenails, peripheral neuropathy of unknown etiology, syncopal episodes which may be vasovagal in nature, circulatory problems, arthritis, and emphysema), aff'd, 988 F.2d 1494 (7th Cir. 1993); cf. United

8

States v. Baron, 914 F. Supp. 660, 664 (D. Mass. 1995) (finding age and infirmity relevant to guideline range where doctors opined that it was unlikely most physicians would be familiar with defendant's relatively uncommon constellation of significant ailments, and that margin for error was low and deterioration could be rapid). Moreover, there is no evidence to suggest that the Bureau of Prisons would be unable to meet the defendant's medical needs. See United States v. Madera-Rivera, 898 F.3d 110, 113–14 (1st Cir. 2018) (declining to depart downward where defendant had not sufficiently demonstrated that the major federal prison medical facilities would be incapable of providing appropriate treatment for his condition); United States v. Studley, 907 F.2d 254, 259 (1st Cir.1990) (downward departure from incarceration to probation for mental and emotional reasons only appropriate where "the defendant has an exceptional need for, or ability to respond to treatment," and "the Bureau of Prisons does not have adequate treatment services.").

      The PSR also recounts the defendant's history of being diagnosed with depression in 2000, and being treated with Paxil (PSR ¶ 43). The defendant has also reported a history of abuse (PSR ¶ 39). The PSR also discusses suicidal ideation, both historic and more recent (PSR ¶ 43). Yet, the PSR also noted that the defendant was referred to counseling, and made progress to the point where she was determined to no longer be in need of regular counseling sessions as of April 2022 (PSR ¶¶ 4, 44). Additionally, while suicidal ideation certainly merits concern and treatment, it should not ordinarily form the basis of a downward departure. See United States v. Harpst, 949 F.2d 860, 863 (6th Cir. 1991) ("A holding by this court embracing downward departures due to suicidal tendencies would, we fear, result in such claims becoming virtual boilerplate in

defendants' arguments before sentencing judges."). Similarly, for abuse to be relevant in supporting a downward departure, it should have some causal relationship contributing to the commission of the offense, such as by bringing about a mental condition that leads to criminal conduct. See United States v. Brady, 417 F.3d 326, 334 (2d Cir. 2005). It is not apparent that this is the case here.

Notably, this Court has previously declined to depart on the basis of emotional disorders, even when combined with physical conditions similar to or greater than what Defendant experiences here. See, e.g., United States v. Stein, No. 93-1945, 1994 U.S. App. LEXIS 22717, at *4 (1st Cir. Aug. 19, 1994) (Maine district court properly rejected argument for departure where defendant suffered a wide range of severe injuries to his back, leg, face, hands, and various internal organs, resulting from an automobile accident; underwent 12 operations since that accident; continued to experience intense headaches and was receiving Social Security disability payments at the time of arrest; and suffered severe emotional depression resulting from the death of his fiancée in a subsequent auto accident); United States v. French, No. 1:12-cr-00160, 2016 U.S. Dist. LEXIS 52753, at *22 (D. Me. Apr. 20, 2016) ("[S]leep apnea, a bad back, PTSD, and a major depressive disorder – even when combined – are unfortunate but not extraordinary or unusual conditions, and Mr. Russell has offered no evidence to suggest that he could not be adequately treated for these conditions within the Bureau of Prisons in the ordinary course."); accord United States v. Lauzon, 938 F.2d 326, 333 (1st Cir. 1991) (affirming Maine district court finding that learning disability and borderline intelligence are "not so extraordinary as to overcome the clear mandate of policy statement § 5H1.3 that mental

10

conditions 'are not ordinarily relevant in determining whether a sentence should be outside the guidelines…'").

In sum, the evidence does not support a downward departure on any of these bases, and the Court should decline to apply one.

**D) The § 3553(a) factors support a sentence at the low end of the guideline range, as well as a term of 3 years of supervised release including all standard and special conditions identified in the PSR.**

1) <u>The nature and circumstances of the offense warrant punishment.</u>

Here, the defendant did not make a singular mistake or falsehood when committing the instant offenses. Rather, she engaged in a pattern of criminal behavior that spanned from 2005 through 2019, and involved multiple omissions, misrepresentations, and false statements to SSA (see PSR ¶¶ 7-9). She failed to inform SSA of her husband's presence in her household, and his financial support, even during continuing eligibility reviews, when provided with reminders to do so (id.). Her application history underscores the intentionality in this conduct, as she initially applied for benefits in October 2004, and was denied as a result of her husband's income, making the salience of this issue clear (see PSR ¶ 6). At a minimum, the defendant's lack of candor warrants an order of full restitution as consequence for the defendant's actions, and a sentence at the low end of the guideline range.

2) <u>The need for deterrence warrants punishment.</u>

SSA pays over $56 billion annually in SSI benefits to more than 8 million recipients.[3] With so many beneficiaries, opportunities for fraud are numerous, and general

---

[3] See <u>Annual Report of the Supplemental Security Income Program</u>, https://www.ssa.gov/oact/ssir/SSI20/ssi2020.pdf (accessed May 12, 2021).

deterrence is an important consideration in this case. See 18 U.S.C. § 3553(a)(2)(B). Although recipients are required to complete periodic benefits reviews, SSA cannot constantly audit all beneficiaries. By their very nature, these benefits programs rely on honest self-reporting. The fact that the fraud in the instant case was not detected until the defendant's husband applied for disability benefits using the same address and telephone number SSA had on file for the defendant (see PSR ¶ 10) underscores this point. SSI benefits are a safety net for the truly desperate, who have extremely limited resources. The defendant's behavior demonstrates a disregard for those who truly qualify for public assistance benefits and rely on them to meet basic needs for food, clothing, shelter, and health care. The defendant's actions deprived not only the government's trust fund, but every individual whose taxes fund these programs and from every individual whose limited financial means qualifies them for these benefits.  When someone abuses these programs by concealing information or making false statements material to the proper payment of benefits, as in the instant case, the Court can deter others from engaging in such abuse by imposing punishment as appropriate.

    3) <u>A downward variance based on the defendant's commission of a white collar offense is not warranted.</u>

In her objections to the PSR, the defendant also indicated that she intended to seek a downward variance on the basis that she committed a white collar offense (see PSR ¶ 67). Notably, however, the guideline for the offense of which the defendant was convicted, § 2B1.1 specifically concerns white collar offenses. See <u>United States v. Rivera</u>, 994 F.2d 942, 955 (1st Cir. 1993) (noting that the embezzlement guidelines (§ 2B1.1) encompass within their heartland cases with normal restitution needs and practicalities, and "reflect[] the Commission's intent to equalize punishments for 'white collar' and 'blue collar'

crime.") (citing United States Sentencing Commission, <u>Supplementary Report on the Initial Sentencing Guidelines and Policy Statements</u> 18 (1987); <u>Hearings Before the Senate Comm. on the Judiciary</u>, 100th Cong., 1st Sess. 54–55 (October 22, 1987)). While <u>Rivera</u> concerned departures during the mandatory guidelines era, the principle is the same: the guidelines for economic crimes are specifically designed by the Sentencing Commission to reflect appropriate punishments for white collar cases as a general matter. While it is appropriate to look to the defendant's personal circumstances to assess the need for specific deterrence, this Court should decline the defendant's invitation to impose a lesser sentence on the basis of general rates of recidivism amongst a particular class of offenses – particularly in the context of the need for general deterrence in economic offenses.

    4) <u>In the event that this Court applies a downward variance on the basis of defendant's age, health, and mental health conditions considered collectively, it should limit the variance and include a sentence of home confinement as a component of any probationary sentence.</u>

The government submits that the evidence does not clearly show that a downward variance on the combined basis of age, health, and mental health conditions is appropriate in this matter. As discussed above, the defendant's mental health provider determined she was no longer in need of ongoing counseling sessions, and it is not clear what ongoing treatment the defendant is receiving for her physical impairments beyond medications. While the government does not dispute that some of her conditions are significant, it is not apparent that the Bureau of Prisons would be incapable of providing appropriate treatment.

Still, the government acknowledges that these factors present a closer case in the context of a variance as opposed to a downward departure. In the event that the Court determines that a downward variance is appropriate, the government submits that it should limit its departure downward, and impose a period of home confinement consistent with

the low end of the effective guideline range as a part of any probationary sentence. This would provide a material consequence for the defendant's actions short of imprisonment, and still support specific and general deterrence.

## V.      CONCLUSION

The Government respectfully requests that the Court order Defendant to make restitution to SSA in the amount of $112,980, and impose a sentence at the low end of the effective guideline range, with three years of supervised release encompassing all conditions set forth in the Revised PSR. This sentence is sufficient, but not greater than necessary, to achieve the purposes of sentencing delineated in 18 U.S.C. § 3553(a)(2).

Dated at Portland, Maine on September 28, 2022.

DARCIE N. MCELWEE
UNITED STATES ATTORNEY

*/s/ Jeanne D. Semivan*
Special Assistant U.S. Attorney
U.S. Attorney's Office
100 Middle Street, East Tower
Portland, ME  04101
(207) 780-3257
jeanne.semivan@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 28, 2022, I electronically filed the above *Government's Sentencing Memorandum* with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Roger Brunelle, Esq.
roger@brunellelaw.com

*/s/ Jeanne D. Semivan*
Special Assistant U.S. Attorney